STATE OF NORTH CAROLINA v. ANTONIO SALAME

No. 7318SC713

(Filed 25 November 1974)

1. **Criminal Law § 7— entrapment — intent originally in mind of officer**

    Entrapment is a defense and prosecution is barred only when it is established that the criminal intent started in the mind of the officer or agent of the State and by him was implanted in the innocent mind of the accused, luring him into commission of an offense which he would not otherwise have committed.

2. **Criminal Law § 7— entrapment — deceit by officers**

    The fact that officers or employees of the government merely afforded opportunities or facilities for the commission of an offense does not defeat the prosecution, nor will the mere fact of deceit defeat a prosecution.

3. **Criminal Law § 7; Narcotics § 4— sale of marijuana — entrapment — sufficiency of evidence**

    State's evidence tending to show that a police officer and his informant did nothing other than inquire of defendant if he had drugs for sale and thereafter arrange a meeting at which such sale might be made and defendant's own admission that he had made at least one prior illegal sale of marijuana furnished a strong basis for inferring that the intent to distribute marijuana was initially defendant's and was not the result of entrapment.

4. **Criminal Law § 7; Narcotics § 4— sale of cocaine — entrapment — sufficiency of evidence**

    Evidence was insufficient to support the defense of entrapment in a prosecution for the sale of cocaine where it tended to show

1

that defendant agreed to make a sale to an undercover police officer, on the next day the officer and a man pretending to be his boss appeared at defendant's room to complete the sale, and the play acting engaged in by the officer and the third person did nothing more than preserve the officer's role as a person engaged in the drug traffic who was ready and able to purchase the cocaine.

**5. Criminal Law § 88— cross-examination of own witness — denial proper**

Where defendant called as his witness the police informant instrumental in bringing about his arrest and thereafter moved to examine the informant as an adverse or hostile witness, the trial court's denial of such motion was not prejudicial since the evidence did not establish that, at the time of defendant's trial, the informant's interests were opposed to defendant's and since the ruling did not impede the defense in any material respect.

**6. Criminal Law § 34— defendant's guilt of other offenses — evidence admissible**

In a prosecution for felonious distribution of marijuana and felonious distribution of cocaine, testimony concerning defendant's dispensing three "speed" tablets and concerning his conversation and negotiations with police officers at a motel for the sale of one-half pound of cocaine, even though relating to events occurring after the offenses for which he was tried had been committed, were sufficiently closely connected in time and circumstances with the offenses charged as to have a logical relevance to show defendant's predisposition to commit those offenses.

**7. Criminal Law § 85— question as to defendant's character — no prejudice**

Defendant was not prejudiced by the trial court's allowance of a question concerning defendant's character and reputation on a college campus for dealing in drugs where the witness responded that he did not know defendant that well and expressed no opinion as to defendant's character or reputation for dealing in drugs or in any other resepect.

APPEAL by defendant from *Martin (Robert M.), Judge,* 14 May 1973 Session of Superior Court held in GUILFORD County.

By separate bills of indictment, proper in form, defendant was charged with (1) the felonious distribution on 27 February 1973 of more than five grams of marijuana to L. R. Mylan, and (2) the felonious distribution on 1 March 1973 of cocaine to L. R. Mylan. Without objection the two cases were consolidated for trial and defendant pled not guilty to both charges.

The State's evidence showed that on 27 February 1973 L. R. Mylan, a detective with the Greensboro Police Department, purchased 453 grams of marijuana from defendant, for which he paid defendant $190.00, and that on 1 March 1973 he purchased

from defendant 27 grams of a powder containing cocaine, for which he paid defendant $950.00. Defendant testified and admitted the two transactions and relied entirely upon the defense of entrapment. In this connection, the State's evidence showed:

For some time prior to February 1973 one Kenny Lawson worked as an informer giving information to the Greensboro Police pertaining to people selling drugs. Lawson also helped to arrange meetings between police officers and sellers of drugs. For this service the police paid Lawson $10.00 or $20.00 at irregular intervals "after the services were performed—after everybody had been arrested." In February 1973 Mylan's job with the police department was as an undercover agent trying to infiltrate the drug traffic in Greensboro. On 26 February 1973 Mylan and Lawson went to Milner Dormitory at Guilford College to purchase marijuana, but the person from whom they planned to make the purchase was not in. On leaving the dormitory, they met defendant, Antonio Salame, whom Lawson had previously known. Lawson introduced Mylan to defendant and asked defendant if he had any cocaine, to which defendant replied that he had sold out. On the following day, 27 February 1973, Mylan, Lawson and a boy known to Mylan as Mike Stovall, a friend of Lawson's, drove together in an automobile to Hardee's Restaurant across from the Guilford College campus. A few minutes later defendant arrived and came to the car in which Mylan and his companions were seated. Defendant handed a plastic bag through the car window to Mylan and then got into the back seat of the car. After getting into the car, defendant stated that he had eight pounds of marijuana in his room at Guilford College, that he had traveled sixty miles to get this, and that Mylan "would buy" this eight pounds for a little over $1,000.00. Mylan replied that he was unable to purchase eight pounds, whereupon defendant asked the other occupants of the car how much money they could get together. Mylan was the only one with money, and defendant then agreed to take $190.00 for the marijuana in the plastic bag, which amount was paid by Mylan and accepted by defendant. The State's chemist subsequently determined that the plastic bag contained 453 grams of marijuana. Regarding this transaction, Mylan testified:

"At this time, I counted out $190.00 to the defendant and gave it to him and he accepted it. He told me that the man with the rest of the drugs would be in his room at 1

State v. Salame

p.m. the next day. . . . He asked me what time I could be in his room. I stated I thought I could be there about 3 p.m. Antonio stated to me that 'you will be there at one.' One o'clock was agreed on and Antonio stated that if we treated him fairly and were honest with him that in the near future he could sell me some cocaine for $5.00 per gram. Antonio stated that he would be going home to his home country of Chile where he had been purchasing the drug. This was also agreed on."

On the following day Mylan and Lawson, accompanied by Detective Hightower of the Greensboro Police Department, went to defendant's room. Hightower was introduced to defendant as Mylan's boss for whom Mylan was purchasing drugs. Hightower pretended to be angry with Mylan for having purchased marijuana, stating that marijuana was "kid stuff," and that he was only interested in cocaine. Hightower asked defendant if he could produce cocaine, and defendant wanted to know in what quantity. Hightower responded that he was interested in pounds. Defendant turned to another person in the room, whose identity was not known to the officers, and asked this person if he thought "the man" could get that quantity and at what price. After conferring with this person, defendant stated he could supply a quantity of cocaine. Defendant was not certain if he could supply pounds, but said he thought he could.

At this meeting in defendant's dormitory room, which took place on 28 February 1973, Hightower, by prearrangement with Mylan, played the part of Mylan's boss and pretended to be a person involved in the drug traffic but who did not handle drugs himself. As part of this pretense, Hightower feigned to be angry with his subordinate, Mylan, for having used Hightower's money to purchase marijuana when he had been instructed to buy cocaine. After making this show of anger, Hightower left the room, slamming the door. Mylan then apologized to defendant for Hightower's conduct and also left.

On the following morning Mylan phoned defendant and arranged to meet him later in the day for the purpose of purchasing cocaine. This phone call was placed from the police station and was recorded. Pursuant to arrangements made in this telephone conversation, Mylan and defendant met on the Guilford College campus, where defendant brought to Mylan's automobile a plastic bag containing a tan and white powder which the State's chemist subsequently analyzed and found to

State v. Salame

contain cocaine. Defendant, after offering Mylan an opportunity to test the powder by "snorting" it and after inhaling two spoonsful himself, delivered the powder to Mylan and received from Mylan $950.00 in cash in exchange. After completing this transaction, defendant and Mylan discussed a possible further purchase, Mylan stating he "would like to get a half-pound in about three weeks," and defendant stating that when he got the drugs together he would contact Mylan. Defendant was arrested on 10 April 1973 at the same time a number of other arrests were made in Guilford County.

Defendant's testimony concerning the foregoing events is summarized as follows: When he met Mylan for the first time and was first introduced to him by Lawson, he did not say that he had just sold out of drugs, he said that he didn't have any. He did tell Mylan he would help him find drugs if he wanted them. Before Lawson and Mylan asked him to get marijuana for them, he had sold marijuana only one time, only one ounce, and he didn't make any money off that sale and had no financial interest in it. He got the marijuana which he sold to Officer Mylan from a person whose name he believed was George. This person brought the marijuana to his room. He had called George by phone, but could not remember the number or whether it was a local or long distance call. He had never dealt in cocaine, and believed that Mr. Hightower was mad because he hadn't been able to get any cocaine. After Mr. Hightower left and slammed the door, he was sympathetic with Mr. Mylan and wanted to help him. On the next day a man, whose identity he did not know, came to his room with two other people whom he did not know, and delivered cocaine to his room. Defendant thought he had seen this man in Mylan's car two nights before, and asked him if this were so, but the man answered no. In defendant's opinion he was the same man. This man remained in defendant's room while defendant delivered the cocaine to Detective Mylan. Defendant returned to his room and gave this man all of the money he got from Mylan. The only profit which defendant got was one gram of cocaine.

On cross-examination, defendant testified that no one put any pressure at all on him to get the marijuana, but that "they" asked him for it and he got it. He also admitted that he had told Mylan at the meeting at Hardee's, on 27 February that he would be going to his home country of Chile and could in the near future sell him cocaine for $5.00 a gram, but defendant

---

State v. Salame

---

testified this was not true, that he had told Mylan this because he wanted to build himself up, to make himself look bigger than he really was. He also admitted meeting with Mylan and Hightower at a motel in downtown Greensboro on 20 March 1973 "to set up a $6,000.00 cocaine buy," but testified that he did not know where he was going to get that cocaine from. He also admitted telling Hightower about smuggling cocaine across the United States border in his belt and sewn in his clothing, but testified that "that was made up too and that was just a big pie in the sky dream," just to make him look bigger than he was. He also admitted telling the officers he could get them a half-pound of cocaine, but testified he did not know whether he could or not and didn't know where he was going to get it.

The jury found defendant guilty in each case, and judgment was entered in each case sentencing defendant to prison for not less than three nor more than five years, the two sentences to run concurrently. Defendant appealed.

*Attorney General Morgan by Assistant Attorney General Thomas B. Wood for the State.*

*Smith, Moore, Smith, Schell & Hunter by Jack W. Floyd for defendant appellant.*

PARKER, Judge.

Prior to arraignment defendant moved to dismiss the charges against him on the grounds that the extent and degree of participation by agents for the State in the commission of the offenses charged resulted in a denial of due process. After conducting a voir dire examination at which Officer Mylan testified concerning the circumstances under which he purchased marijuana and cocaine from defendant and concerning the activities of the police informant, Kenny Lawson, the court denied defendant's motion to dismiss. In this ruling we find no error. We also find no error in the denial of defendant's renewed motion for nonsuit, made at the close of the evidence upon the same grounds of denial of due process.

[1] It is, of course, elementary that the State has no business fostering crime and that it is no part of the duty of law enforcement officers to incite crime for the sole purpose of punishing it. But a "clear distinction is to be drawn between inducing a person to commit a crime he did not contemplate doing, and the setting of a trap to catch him in the execution

of a crime of his own conception." *State v. Burnette,* 242 N.C. 164, 169, 87 S.E. 2d 191, 194 (1955). The determinant is the point of origin of the criminal intent. Entrapment is a defense and prosecution is barred only when it is established that the criminal intent started in the mind of the officer or agent of the State and by him was implanted in the innocent mind of the accused, luring him into commission of an offense which he would not otherwise have committed. In this State the burden is on the defendant to establish the defense of entrapment to the satisfaction of the jury. *State v. Cook,* 263 N.C. 730, 140 S.E. 2d 305 (1965) ; *State v. Bland,* 19 N.C. App. 560, 199 S.E. 2d 497 (1973) ; *State v. Williams,* 14 N.C. App. 431, 188 S.E. 2d 717 (1972).

[2] The fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution, nor will the mere fact of deceit defeat a prosecution, "for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *United States v. Russell,* 411 U.S. 423, 436, 36 L. Ed. 2d 366, 376, 93 S.Ct. 1637, 1645 (1973). In *Russell* the United States Supreme Court reaffirmed its prior decisions which made defendant's predisposition to commit the crime the central inquiry when the defense of entrapment is raised and a majority of the Court expressly declined to make the defense turn on the type and degree of governmental conduct involved. In that connection the following observation made by Justice Rehnquist in the majority opinion of the Court is pertinent to the case now before us:

> "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California,* 342 U.S. 165, 96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R. 2d 1396 (1952), the instant case is distinctly not of that breed." 411 U.S. 423, 431-32, 36 L.Ed. 2d 366, 373, 93 S.Ct. 1637, 1643 (1973).

In our opinion the evidence in the case now before us furnishes no stronger basis than did the evidence in *Russell* for invoking due process principles to bar defendant's convictions.

Indeed, many of the circumstances of the present case simply do not constitute illegal entrapment.

> "Included in the list of circumstances which do not constitute illegal entrapment are: the making of 'buys,' from persons reasonably suspect, by law enforcement officials acting through informers, usually narcotic addicts; acts of enforcement officers posing as addicts in order to procure a purchase from persons who previous investigation indicated were engaged in illegal traffic in narcotics; solicitation by officers of sales in the ordinary way as between buyer and seller; procuring by officers of illegal prescriptions from physicians; purchases by officials solicited by narcotics peddlers; decoy letters, etc." Annot., Entrapment —Narcotics Offense, 33 A.L.R. 2d 883, 885.

[3]  Applying the foregoing principles to the present case, it is questionable whether the defense of entrapment arises at all upon the evidence insofar as the charge of illegal distribution of marijuana is concerned. Nothing in the State's evidence suggests that either Officer Mylan or his informer, Lawson, did anything other than inquiring of defendant if he had drugs for sale and thereafter arranging a meeting at which such a sale might be made. Defendant, who had the burden of proof, offered no evidence to the contrary, and his own admission to having made at least one prior illegal sale of marijuana, coupled with the uncontradicted evidence showing that he readily acquiesced in selling a substantial amount of marijuana to Mylan, furnishes strong basis for inferring that the intent to commit the offense was initially his.

[4]  Evidence of entrapment in the case of the sale of cocaine is scarcely stronger. The playacting engaged in by Hightower and Mylan did nothing more than to preserve Mylan's role as a person engaged in the drug traffic who was ready and able to purchase the cocaine which, on the previous day, defendant had already expressed a willingness to sell. Defendant's testimony that the cocaine which he sold to Mylan was supplied him by some man whom he could not identify but whom he believed to be the same man he had seen in Mylan's car two nights previously, furnishes at most only weak support for the defense theory that some agent for the State supplied defendant with cocaine in order that he might be arrested for selling it. At most this presented a question for the jury and clearly did not compel dismissal by the court as a matter of law. We hold that

State v. Salame

defendant's motions for dismissal and for nonsuit were properly denied.

[5]   At the close of the State's evidence, the defendant called Kenny Lawson, who had not previously testified, to the witness stand. Thereafter, defense counsel, before and during direct and redirect examination, requested that he be allowed to examine Lawson as an adverse or hostile witness, but the trial court denied these motions. We do not agree with defendant's contention that these determinations require reversal. First, the evidence does not establish that, at the time of defendant's trial, Lawson's interests were opposed to defendant's. For some time Lawson had operated as a part-time undercover agent for the Narcotics Division of the Greensboro Police Department. He was not salaried for this activity but did receive occasional payments ranging as high as $20.00. Although this arrangement provided him with a moderate financial incentive for bringing individuals into incriminating contact with the police, at the time of defendant's trial Lawson's monetary interest in defendant's drug activities was at an end. Lawson had already received such payment as he might expect in defendant's case and could expect no additional remuneration for defendant's subsequent conviction. Second, we are unable to find that the trial court's rulings prejudiced or impeded the defense in any material respect. Even a cursory review of Lawson's testimony upon direct and redirect examination indicates that the court permitted defense counsel to question Lawson at great length upon a wide variety of subjects. A careful review of this testimony reveals that such questioning was, in form and effect, a cross-examination. Lawson was intensively interrogated about his unsavory past, including his own involvement with drugs, as well as about the details of his undercover techniques and remuneration. He appeared to answer all questions freely and with reasonable clarity. We find no prejudicial error on the court's failure to grant defendant's motion that Lawson be formally designated as a hostile witness.

[6]   Defendant assigns error to the court's rulings which permitted the State's witnesses, Hightower and Mylan, to testify over defendant's objections concerning a meeting which they had with defendant at a downtown motel on 20 March 1973 at which defendant discussed with the two police officers the possibility of his obtaining and selling to them a half-pound of cocaine for a price of between five and six thousand dollars. At this meeting defendant further described to the officers how

he had once smuggled cocaine across the border. Defendant also assigns error to the court's permitting Lawson to testify over defendant's objections concerning an occasion which took place about the second week in March 1973, when defendant gave Lawson's fourteen-year-old girl friend three "speed" tablets. Defendant challenges the relevancy of all of this evidence as it bears upon his guilt or innocence of the offenses for which he was being tried. It is true that ordinarily evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged. 1 Stansbury's N. C. Evidence, § 91 (Brandis Revision, 1973). In this case, however, defendant did not deny that he committed the offenses with which he was charged. He testified himself that he made the sales described in the indictments against him. His sole defense was that he was entrapped by the officers or their agents into making these sales. As above noted, when the defense of entrapment is raised, defendant's predisposition to commit the crime becomes the central inquiry. We hold that the testimony concerning defendant's dispensing the three "speed" tablets and concerning his conversation and negotiations with the officers at the motel on 20 March 1973, even though relating to events occurring after the offenses for which he was tried had been committed, were sufficiently closely connected in time and circumstances with the offenses charged as to have a logical relevance to show defendant's predisposition to commit those offenses. We find no error in the admission of this evidence.

[7] The defense presented the testimony of one Crowell, a fellow student of defendant's at Guilford College, who testified on direct examination concerning Lawson's activities on the campus. On cross-examination the district attorney asked Crowell if he knew defendant's character and reputation on the campus for dealing in drugs. Defendant's counsel interposed an objection, which the court overruled. Defendant's counsel now contends this ruling was error, pointing out that at the time the question was asked defendant had not yet testified or otherwise put his character at issue. If it be conceded that the objection should have been sustained, no prejudice resulted to the defendant in this case. Crowell answered the question simply that he did not know defendant that well and expressed no opinion as to defendant's character or reputation for dealing in drugs or in any other respect.

We have carefully examined all of defendant's remaining assignments of error and find no error sufficiently prejudicial to warrant granting a new trial. The district attorney's argument to the jury, though forceful, did not go beyond proper limits and certainly did not resemble the jury argument condemned in *State v. Smith*, 279 N.C. 163, 181 S.E. 2d 458 (1971), cited by defendant. In the one instance in which defendant's counsel interposed an objection because of the district attorney's misstatement of a portion of Officer Mylan's testimony, the trial judge properly instructed the jury to be governed by their own recollection of the evidence. We find the court's jury charge sufficiently complete and free from prejudicial error. In the trial and judgments appealed from we find

No error.

Chief Judge BROCK and Judge BALEY concur.