INMAN, Judge, dissenting.
*534 Because the evidence required the trial court to instruct the jury on Defendant's defense that he was entrapped by Detective Heavner, I respectfully dissent.
"It is the duty of the court to charge the jury on all substantial features of the case arising on the evidence ... [a]nd all defenses presented by defendant's evidence are substantial features of the case[,]" State v. Dooley , 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974) (citations omitted). This duty is particularly important when the defense concerns the conduct of State actors.[1] I would hold the trial court committed prejudicial error in denying Defendant's request for an instruction on entrapment, vacate his conviction, and remand for a new trial. I express no opinion regarding whether Defendant is guilty or innocent-that question is reserved for a jury.
I. FACTUAL HISTORY
As the majority rightly points out, although Defendant bears the burden of proof in seeking an entrapment instruction,[2] resolution of this appeal requires us to consider the evidence introduced at trial in the light most favorable to the Defendant. We also, "[f]or purposes of the entrapment issue, ... must assume that [D]efendant's testimony is true." State v. Foster , 235 N.C. App. 365, 374, 761 S.E.2d 208, 215 (2014) ; see also *585 State v. Ott , 236 N.C. App. 648, 652, 763 S.E.2d 530, 533 (2014). Given this standard of review, examination of Defendant's evidence not addressed in the majority opinion, including Defendant's testimony, is necessary.
Defendant testified at trial that he sought personal relationships with men via Craigslist, as opposed to other online services, because children frequented other websites and Craigslist requires each user to verify *535 that he is eighteen or older. Defendant posted "off and on" to Craigslist, sometimes looking to "meet somebody" on the Casual Encounters section of the site, which largely, but not exclusively, featured people looking for sex. He testified that after meeting someone online, he would "take care of them and help them out until they move on, ... that's just what I do." He further explained that he "enjoy[s] having somebody to take care of. Not for sex. ... That, that's not what it's about. It's about just being needed and taking care of somebody." Defendant characterized these relationships as offering "[c]ompanionship," admitting that sex "[o]ccasionally" factored into them but also insisting that "[i]t's not every time, no. ... [It] wasn't a primary objective." Instead of sex, Defendant testified, the common element was simply helping the person until he could get back on his feet by offering a free place to stay, assistance with employment or school, and money for clothes and transportation.
Defendant met hundreds of men on Craigslist; some of the men moved in with Defendant and "[s]ome just bec[a]me friends." For example, Defendant, after responding to ads in the Casual Encounters section of Craigslist, met two young men and allowed them to move into his house. Defendant bought the men clothes and gave them money, but he never had sex with either of them.[3] Although Defendant testified that he had sex with four men who had previously lived with him-only one of whom he met on Craigslist-each was eighteen or older.[4] Defendant flatly denied ever soliciting a minor on Craigslist or otherwise.
Defendant testified that he responded to Detective Heavner's Craigslist ad not because he was seeking sex with a minor, but because he wanted to make his boyfriend jealous. Defendant admitted that his first response to Detective Heavner's Craigslist ad was sexual in nature.
*536 He also testified, however, that he believed he was responding to an ad placed by an adult. Defendant admitted to discussing sex with Detective Heavner in their early text messages back and forth, but these text messages all occurred before Detective Heavner disclosed "Kelly's" age. After these initial messages, Detective Heavner texted the following: "I may be to[o] young but I am needing a place to go, my aunt is about to put me back in foster care and I will run away if she does[.]" Defendant replied by asking how old "Kelly" was and stated "[i]f you're 17 it's legal." "Kelly" responded: "I am a good kid, just my parents are shit bags and are in prison and I am the one suffering, I am not quiet [sic] 16 and actually 16 is the legal age."
Defendant testified he did not recall seeing a reference to "Kelly" being under sixteen at the time he was texting with Detective Heavner, but that he "was under the impression" from the text messages that "Kelly" was seventeen years old and under the age of eighteen, not fifteen years old and under the *586 age of consent. Defendant also testified that he would not have sex with anyone under eighteen. Defendant's next mention of sex confirms this: "Well. I could let you live here with me and take care of you[.] ... But we could not have sex till [sic] you was [sic] old enough." Defendant then reiterated his desire not to have sex with "Kelly" if he was underage: "But I do not want to go to jail. ... So I could not have sex till [sic] you was [sic] old enough."
As pointed out by the majority, Defendant continued to interact with "Kelly" after learning he was under eighteen. He did so, per his testimony, to "make sure this person is okay[,]" because "when ['Kelly'] started talking about [how] he was living with his aunt and she didn't want him, his parents [were] in jail, he was going to run away, he was going to find the next available guy, I remember telling him that's dangerous, you know, you could get hurt." His testimony continued:
[DEFENDANT:] I still kept talking to ["Kelly"] because he said, "If you don't quit talking to me, I'm going to go ahead and get somebody else."
I said, "No, no, no. Don't do that."
So now I'm really concerned. You know, there's crazy people out there.
....
[DEFENDANT'S COUNSEL:] Okay. And after you had texted that, "We can wait until you are old enough," who brought up the idea of any other sexual act or - *537 [DEFENDANT:] Detective [Heavner] is the only one that brought up anything sexual.
....
Sex was not on my mind at this time. The only thing that was on my mind was that this person was really going to go out and meet somebody else. Was he really without food? Was he really without clothes? Was he really in a situation where his aunt didn't want him? His parents are in prison. If all this is true, it's all the factors for danger.
Following Defendant's expression of his unwillingness to have sex with "Kelly" as a minor because he did not want to go to prison, it was Detective Heavner, and not Defendant, who re-initiated the discussion of sex. Ensuing responses from Defendant certainly could be construed by a jury-which, unlike this Court, is not bound by any presumption favorable to Defendant-to indicate sexual interest in "Kelly." At trial, however, Defendant offered non-sexual explanations for many of these comments, which our precedents require us to take as true. Foster , 235 N.C. App. at 374, 761 S.E.2d at 215 ; Ott , 236 N.C. App. at 652, 763 S.E.2d at 533.
Defendant's text messages included a request for a picture of "Kelly's" face, which Defendant testified he asked for in order to try and verify "Kelly's" age, and a statement that "[w]e could do all you wanted to do if you was my boy[,]" which Defendant described as offering "Kelly" a place to live without the fulfillment of any sexual desires.[5] At one point in the conversation, "Kelly" stated he wanted Defendant to be the first man with whom he had sex; four messages later, Defendant replied, "Ok. Well we can fix that. We will go slow[,]" a remark not inconsistent with an intent to wait until "Kelly" was older.
Shortly after Defendant's message to "Kelly" that they would "go slow," Officer Heavner proposed meeting immediately. Defendant responded with an offer to meet the following day. "Kelly" replied by texting: "Ok. ... I want to perform oral sex on [you] really bad for some reason can we do that[?]" Defendant demurred, texting he did not want to talk about sex; he testified at trial that it was his practice to refrain from talking about sex via text message on his phone because he found *538 it vulgar. The issue did not arise again until several messages later, when "Kelly" expressed a fear that he might not be gay, and was therefore unsure if he should move in with Defendant without having sex together first. Defendant responded that he had previously said they could have sex; "Kelly" replied, "[y]ou said we could when I am old *587 enough for [you.]" Defendant once more requested that they not discuss sex through text messages. That statement was followed by this exchange:
[DETECTIVE HEAVNER:] You said ["]I said we could["] so does that mean yes [because] if not I may have to find someone else first to see what its like[.]
[DEFENDANT:] Yes[.]
....
[DEFENDANT:] Don't find anyone else. Please[.]
[DETECTIVE HEAVNER:] Only if we can have oral sex and anal tomorrow so I will know, just give me a yes or no and I will shut up about it[.]
[DEFENDANT:] Yes[.]
Defendant testified he made these statements because he did not want "Kelly," in an effort to escape a desperate home life, to find another man who might be dangerous, and that he "just said 'yes' to shut ['Kelly'] up." Detective Heavner issued his ultimatum after Defendant had warned "Kelly" that other men might try to harm him. After the ultimatum, Defendant did not engage in any sexually explicit conversation or discuss any sex acts with "Kelly," despite Detective Heavner repeatedly doing so; indeed, Defendant again asked "Kelly" to "[s]top talking about sex stuff."
The text messages eventually returned to the topic of the logistics of meeting, with Defendant agreeing to meet the following day around lunchtime. Defendant testified that he agreed to that arrangement because it would offer him the chance:
to sit down and speak with ["Kelly's"] aunt and [a neighbor Detective Heavner had mentioned in an earlier message], [to] make sure everybody knew what was going on. If he did need a place, I would take him back. I had the room. I would give him a place to live and t[ake] care of him and provide[ ] him things.
....
*539 That's why I wanted to talk to his aunt and the neighbor[.]
Following further discussion about picking up "Kelly," Defendant travelled to Lincolnton and was arrested at the meeting spot.
II. ANALYSIS
A. Defendant's Intent
The majority holds that Defendant had the requisite intent to solicit a minor for sex, so that an entrapment instruction was improper. The majority's position, however, is based on several assertions that are not supported by the evidence when it is considered in the light most favorable to the Defendant, as required by the applicable standard of review. Ott, 236 N.C. App. at 651-52, 763 S.E.2d at 533.
First, the majority states that "after 'Kelly' told Defendant he was fifteen-years-old and may be too young, Defendant continued to speak with Kelly[,]" later "sen[ding] sexually explicit messages to someone he believed was underage[.]" The evidence presented at trial, when considered in the light mandated by our precedents, does not support this contention. Defendant testified that he initially believed he was conversing with someone eighteen or older. When "Kelly" texted that he was not eighteen, Defendant testified, he did not actually understand that "Kelly" was fifteen, but was instead "under the impression" he was seventeen. Defendant testified that he did not "sen[d] sexually explicit messages to someone he believed was underage," as asserted by the majority. Although the jury might not have believed this testimony and rejected Defendant's entrapment defense, our precedents require that, when considering whether the instruction was mandated, i.e. , whether the jury should decide this issue, we must take Defendant at his word. Foster , 235 N.C. App. at 374, 761 S.E.2d at 215 ; Ott , 236 N.C. App. at 652, 763 S.E.2d at 533.
Second, the majority writes that Defendant "attempted to meet 'Kelly' for the purpose of engaging in sexual acts" and "[t]hereafter ... readily agreed to have oral and anal sex with 'Kelly' when they were to meet." But Defendant testified that once he suspected "Kelly" was under eighteen, he expressly refused to have sex with him until he was older, ceasing further sexual comments until the subject was brought back up by Detective Heavner. Although Defendant sent additional *588 messages after that point, those messages are not inconsistent with an intent to have sex only once "Kelly" was of age. Defendant provided non-sexual explanations for many of those texts. Defendant also testified that he did not attempt to meet "Kelly" "for the purpose of engaging in sexual *540 acts[,]" and that he only agreed to have sex with "Kelly" to get him to "shut up" for fear that he would be left to a damaging home life or end up in physical danger. The majority's assertion that Defendant "readily agreed to have oral and anal sex with 'Kelly' " and travelled to Lincolnton for that purpose is not supported by this evidence when considered in a light favorable to Defendant.
This Court has previously held a defendant presented evidence sufficient to merit an entrapment instruction where, according to his testimony, he first expressed disinterest in committing the criminal act but was later induced by acts of law enforcement that "involved emotional manipulation[,] including creating a false relationship and then taking advantage of the defendant's desire to maintain that relationship." Foster , 235 N.C. App. at 375, 761 S.E.2d at 215. Similarly, Defendant's testimony, considered in the light most favorable to him, establishes that he did not "readily" assent to engage in sex with "Kelly" as a person under the age of sixteen. Defendant testified in pertinent part:
Sex was not on my mind at this time. The only thing [that] was on my mind was that this person was really going to go out and meet somebody else. Was he really without food? Was he really without clothes? Was he really in a situation where his aunt didn't want him? His parents are in prison. If all this is true, it's all the factors for danger.
We are required to accept as true Defendant's testimony that he did not intend to commit a crime prior to Detective Heavner's inducement and only agreed to commit the crime, to the extent he did so, once Detective Heavner "implant[ed] the criminal design." State v. Salame , 24 N.C. App. 1, 7, 210 S.E.2d 77, 82 (1974) (citation and internal quotation marks omitted).
B. Predisposition
I also disagree with the majority's conclusion that, viewed in the light most favorable to Defendant, the evidence shows he was predisposed to commit the crime charged absent inducement by Detective Heavner. The majority characterizes the evidence as showing that Defendant: (1) had a history of interacting with men on Craigslist; (2) invited three such men to live with him in his home, including a sixteen-year-old with whom he had sex; (3) continued to converse with "Kelly" after Detective Heavner disclosed his age; (4) promised to take care of "Kelly" and later agreed to have sex with him; and (5) acknowledged he had sex with men who previously lived with him in his home. As recounted supra , this view simply overlooks evidence favorable to Defendant.
*541 Most notably, Defendant did not testify that he had ever hosted or engaged in sex with a sixteen-year-old in his home. Rather, he testified that more than three decades earlier, when he was nineteen and living in another state, he and a sixteen-year-old boy engaged in mutual fondling. Also, when considered in the light required by our precedents, Defendant's evidence shows that: (1) three adult men moved in with Defendant after meeting him on Craigslist, only one of whom had sex with Defendant; (2) Defendant has lived with four boyfriends, all over the age of eighteen, including the one he met on Craigslist;[6] (3) Defendant believed "Kelly" was seventeen, not fifteen, and immediately refused sex with "Kelly" if he was under eighteen; (4) Defendant's offer to "take care of 'Kelly' " did not necessarily include sex; and (5) Defendant agreed to have sex with "Kelly" not with the intent to have sex with him, but out of a concern that a refusal would leave "Kelly" in danger.
The evidence in this case is in stark contrast to State v. Morse , 194 N.C. App. 685, 671 S.E.2d 538 (2009), the authority relied upon by the majority. Although the majority *589 correctly notes that the defendant in Morse , like Defendant here, "had previously engaged in sexually explicit communications with other users in adults only chat rooms and even met with one ... to engage in sexual contact[,]" 194 N.C. App. at 692, 671 S.E.2d at 543, that was but one factor in a multi-faceted analysis by this Court:
Furthermore, defendant admitted that he had previously chatted with underage juveniles . Defendant was familiar, not only with the ease with which an underage juvenile could access the adults only chat room, but also with the idea that other users can and often do falsely represent their names, age, and appearance. At trial, defendant admitted that he had looked at baywatch142000's profile, which listed her age as "114" and included ... "Actually 14." Defendant testified, however, that he looked at the profile merely to view baywatch142000's photograph and thus initially overlooked her age. Defendant further contended that he was not thinking about age at all, but rather was in a "sexual mindframe" when chatting with baywatch142000.
*542 In spite of this testimony, defendant admittedly did not hesitate to initiate sexually charged conversation with baywatch142000 within the first few minutes of chatting, or to begin making arrangements to meet for sexual contact . Furthermore, defendant did not, at any time during their chats, express reluctance to meet with baywatch142000, despite baywatch142000's repeated references to her age . Baywatch142000 made it clear that she was a fourteen-year-old high school student, a virgin, and interested in finding an older friend in order to gain sexual experience. ... Throughout their chats, baywatch142000 was, for the most part, merely responsive to defendant's suggestions, while defendant took the more active role in both the sexually charged conversation and in planning their meeting .
Id. at 692-93, 671 S.E.2d at 543-44 (emphasis added).
From that evidence, we determined that the defendant in Morse was not entitled to an entrapment instruction on his solicitation of a child charge, the same crime at issue in this case:
Solicitation ... elementally involves some impetus on defendant's part, rather than mere acquiescence. ... Our precedent indicates that a trial court may properly refuse to instruct a jury on entrapment when defendant required little urging before acquiescing to requests by undercover officers. Here, the record contains ample evidence which tends to show that defendant did more than merely acquiesce and cooperate with a plan formed by police. ... Such initiative goes far beyond the mere compliance, acquiescence in, or willingness to cooperate which is sufficient to show predisposition.
Id. at 693-94, 671 S.E.2d at 544 (citations and quotation marks omitted) (emphasis in original).
Here, unlike the defendant in Morse , Defendant did not have advance notice of "Kelly's" age when he responded to Detective Heavner's Craigslist ad; instead, Defendant initially believed "Kelly" was at least eighteen based on Craigslist's age verification requirement. Nor did the State present any evidence Defendant had ever before engaged in sexually explicit conversations with anyone underage; rather, Defendant unreservedly testified he had never done so. Also unlike the defendant in Morse , Defendant repeatedly stated his refusal to have sex with "Kelly"
*543 once he suspected he was under eighteen. It was Detective Heavner, only after Defendant expressed that refusal, who reintroduced sex into the conversation; it was also Detective Heavner who repeatedly pressed Defendant to meet "Kelly."[7] Finally, Defendant testified *590 "sex was not on my mind" when he agreed to meet "Kelly" after learning he was under eighteen, expressly disclaiming the "sexual mindframe" the defendant in Morse admitted to holding.
In short, Morse is distinguishable. Defendant's evidence, taken in the light most favorable to him, would allow a reasonable juror to infer that he was not predisposed to commit the crime for which he was convicted, and that he assented to Detective Heavner's plan after repeated denials and only when he believed the alternative would place "Kelly" in danger. Defendant was entitled to the entrapment instruction so the jury could evaluate and determine for itself whether Defendant was entrapped.
C. The Availability of the Defense
The State argues that Defendant could not claim the entrapment defense because he denied possessing the necessary criminal intent to convict him of soliciting a child. The majority does not address this argument; because I would vacate Defendant's conviction and remand for a new trial, I address this issue.
Both the State and Defendant cite State v. Neville , 302 N.C. 623, 276 S.E.2d 373 (1981), each asserting it supports their respective positions. In Neville , the defendant denied committing the acts alleged and was denied an entrapment instruction. 302 N.C. at 626, 276 S.E.2d at 375. Our Supreme Court rejected the defendant's argument that such a denial was error, holding "[t]he defense of entrapment presupposes the existence of the acts constituting the offense. Where a defendant claims he has not done an act, he cannot also claim that the government induced him to do that act." Id. (citations omitted). The Supreme Court distinguished denials of acts from denials of criminal intent, plainly rejecting the argument advanced by the State here: "[T]he entrapment *544 defense is not inconsistent with the defense of lack of mental state since the defense of entrapment itself is an assertion that it was the will of the government, and not of the defendant, which spawned the commission of the offense." Id. (citation omitted); see also State v. Sanders , 95 N.C. App. 56, 61, 381 S.E.2d 827, 830 (1989) ("[A] defendant who denies an essential element which deals with intent but who admits committing the acts underlying the offense with which he is charged may employ an entrapment defense ." (emphasis added)).
At trial, Defendant's counsel acknowledged he had admitted to committing the acts constituting the offense for which he was charged-i.e. , exchanging messages via computer regarding plans to engage in sex with "Kelly" and driving to Lincolnton to meet him. He only denies possessing the requisite criminal intent to engage in a sex act with a minor. Following Neville and Sanders , I would hold the State's argument on this question unavailing.
D. Prejudice
Defendant has demonstrated that the trial court's error in denying an entrapment instruction prejudiced him. Almost two hours into deliberations and after an initial request for reinstruction on the elements, the jury sent the following note to the trial judge: "Please define intent to have sex with a minor. Does it matter if the defendant's intent is to have sex when the boy is underage or if his intent is to wait until-is to wait to have sex until the boy is of age? " (Emphasis added). The trial court, during a hearing outside the jury's presence, told counsel that "what I would tell them is ... it would not be a violation of the law to have intent to have sex after he's of age." When jurors returned to the courtroom, the trial court instructed them as follows: "It would constitute a violation of the law to have intent with a boy who is underage. It would not be a violation of the criminal code to ... intend to have sex with someone who is not underage." Ten minutes later, the jury requested reinstruction on the elements of the crime charged. Four minutes after that reinstruction was given, the jury informed the trial court that it had reached a verdict, which resulted in this rather irregular dialogue:
THE COURT: ... You have a unanimous decision?
*591 THE FOREPERSON: We have made a decision.
THE COURT: And is it a unanimous decision?
THE FOREPERSON: It was not a unanimous decision.
THE COURT: Okay. And is it by majority vote ... ? Because the decision must be unanimous.
*545 ....
THE FOREPERSON: Oh, it was unanimous.
THE COURT: Okay.
THE FOREPERSON: I'm sorry.
....
THE COURT: ... "Unanimous" meaning all 12 are in agreement with this decision?
THE FOREPERSON: No. No.
JURORS: No. No.
THE FOREPERSON: I think we are confused.
THE COURT: All right. ... [T]he decision must be unanimous. If you have not completed your discussions, then we need to decide when you are coming back because we will be closing court this afternoon. There's no timetable. There's no-
THE FOREPERSON: We're done. I just-I think that maybe we are misunderstanding what you're trying to ask us.
THE COURT: Well, the decision of whether or not an individual is guilty or not guilty must be unanimous. Must be the decision that 12 believe guilty or 12 believe not guilty. That's what we mean by "unanimous."
THE FOREPERSON: Oh. Then, no, we are not unanimous.
THE COURT: Okay. Then I'm going to send you back to the jury room.
....
So I'm not sure I understand where we are.
THE FOREPERSON: Everyone has made their own personal decision.
The trial court then reiterated the necessity of a unanimous decision but recessed court until the following morning. After more than an hour of deliberations the next day, the jury returned a unanimous verdict of guilty.
*546 As noted above, Defendant admitted to the acts constituting the crime and only denied possessing the requisite criminal intent. With Defendant's mindset being the only element at issue before it, the jury's multiple requests for additional instructions on the elements-and specifically as to Defendant's intent-coupled with its apparent difficulty in arriving at a unanimous verdict demonstrate "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" N.C. Gen. Stat. § 15A-1443 (2017).
III. CONCLUSION
Respecting the limitations of appellate review, I dissent not because I conclude that Defendant has established the defense of entrapment, but because the law requires us to take his testimony to be true for the limited purpose of determining whether a jury might find that Defendant has proven that defense to its satisfaction. Following controlling precedents, I would vacate Defendant's conviction and remand for a new trial.

The defense of entrapment is itself a check on unwarranted government intrusion into the lives of the citizenry and a limitation on the misallocation of State resources: "[L]aw enforcement tactics that seek to induce persons who are not predisposed to crime to engage in criminal activity are intolerable for two reasons. First, individuals have a strong interest in privacy: law-abiding people should be left alone by the government. Second, law enforcement resources are wasted when the subjects of investigation are not predisposed to commit crimes." Entrapment Through Unsuspecting Middlemen , 95 Harv. L. Rev. 1122, 1130-31 (1982) (footnotes omitted).

Defendant bears "the burden of proving entrapment to the satisfaction of the jury." State v. Davis , 126 N.C. App. 415, 418, 485 S.E.2d 329, 331 (1997). The measure of proof that satisfies this burden is for the jury to determine, and may be as low as a bare preponderance of the evidence. State v. Miller , --- N.C. App. ----, ----, 812 S.E.2d 692, 695 (2018).

Despite their Craigslist personals referring to them as "boys," both of these men were eighteen years old or older. Defendant testified that he "call[ed] everybody 'boy'[,]" particularly people under the age of 25, and another witness who testified at trial corroborated Defendant's testimony that he used the word to refer to adult men younger than him. Defendant further testified that he understood Detective Heavner's use of the phrase "boy toy" to refer to a younger man with an older man, but that Defendant did not believe it carried a sexual connotation. Defendant also testified that he used the word "boy" in correspondence with Detective Heavner to mean "[a] person that I take care of."

The majority asserts Defendant had sex with a sixteen-year-old boy who moved into Defendant's home after interacting with him on Craigslist. This fact is simply not supported by the evidence when viewed in the light most favorable to the Defendant. Although Defendant admitted texting Detective Heavner that he "had one boy I played with when he was 16 but turned 17 the next week[,]" he testified that this referred to a sexual encounter he had at the age of nineteen, 33 years earlier. In any event, sixteen is the age of consent in North Carolina. N.C. Gen. Stat. §§ 14-27.25 and 14-27.30 (2017).

As recounted supra , Defendant testified that he used the word "boy" with Detective Heavner to describe men he takes care of, a relationship he explained elsewhere in his testimony as not necessarily involving sex.

I would not hold, as a matter of law, that a man's prior sexual experiences with consenting male partners, all above the age of consent, indicate that he is predisposed to engaging in sexual activity with a child.

Detective Heavner first requested they meet before disclosing "Kelly's" age, a request that Defendant did not address. Detective Heavner again raised the issue after further conversation, asking "[s]o when ya wanna do this[?]" When Defendant did not respond to the question a second time, Detective Heavner reiterated "Kelly's" desire to meet immediately: "Look I am serious if [you are], I can leave[.] [A]ll I got to do is tell my aunt I found somewhere to go, she will be happy." Defendant responded that he was serious, to which "Kelly" replied "I really want to do this like today[.] ... Seriously come get me[.]" It was at that point that Defendant offered to meet "Kelly" the following day.